# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2220

_____

Cierra Dunn; Verchon DeBrossard; Michael Klingenberg; Trentae Fugate; Cameron Lard; Sophia Jacobsen; Jivonte Johnson; Jayvione Lewis; Makenzie Moler; Jaquan Patton; Joshua Petefish; Emma Timberlake; Harrison Woods; Tony Young

*Plaintiffs - Appellees*

v.

John Does, 1-22; Ian Lawler; Michael McTaggart; Brandon Holtan; Chris Hardy; Brendan Egan; Jeremy Betts

*Defendants - Appellants*

Tyler Palmer

*Defendant*

David Chiodo; Timothy Coughennower; Benjamin McCarthy

*Defendants - Appellants*

Nick Smith

*Defendant*

Adam Herman; Todd Wilshusen

*Defendants - Appellants*

Appellate Case: 23-2268    Page: 1    Date Filed: 09/30/2024 Entry ID: 5441087

Ken Callahan

*Defendant*

Ryan Armstrong

*Defendant - Appellant*

Tyler Moffatt

*Defendant*

Jacob Hedlund; Kyle Gruver; Nicholas Valentine; Clark Allen; Ernesto Escobar-Hernandez

*Defendants - Appellants*

Chad Nicolino; Jeffrey George

*Defendant*s

Brad Youngblut

*Defendant - Appellant*

Jake Forrester

*Defendant*

Kirk Bagby

*Defendant - Appellant*

Dana Wingert; City of Des Moines, Iowa; Polk County Iowa; City of West Des Moines; City of Altoona

*Defendant*s
_____

-2-

No. 23-2268
_____

Cierra Dunn; Verchon Debrossard; Michael Klingenberg; Trentae Fugate; Cameron Lard; Sophia Jacobsen; Jivonte Johnson; Jayvione Lewis; Makenzie Moler; Jaquan Patton; Joshua Petefish

*Plaintiff*s

Emma Timberlake

*Plaintiff - Appellee*

Harrison Woods; Tony Young

*Plaintiff*s

v.

John Does, 1-22; Ian Lawler; Michael McTaggart; Brandon Holtan; Chris Hardy; Brendan Egan; Jeremy Betts; Tyler Palmer; David Chiodo; Timothy Coughennower; Benjamin McCarthy

*Defendant*s

Nick Smith

*Defendant - Appellant*

Adam Herman; Todd Wilshusen; Ken Callahan; Ryan Armstrong; Tyler Moffatt; Jacob Hedlund; Kyle Gruver; Nicholas Valentine; Clark Allen; Ernesto Escobar-Hernandez; Chad Nicolino; Jeffrey George; Brad Youngblut; Jake Forrester; Kirk Bagby; Dana Wingert; City of Des Moines, Iowa

*Defendant*s

Polk County Iowa

*Defendant - Appellant*

-3-

City of West Des Moines; City of Altoona

*Defendant*s

_____

No. 23-2304
_____

Cierra Dunn

*Plaintiff - Appellant*

Verchon Debrossard; Michael Klingenberg

*Plaintiff*s

Trentae Fugate

*Plaintiff - Appellant*

Cameron Lard; Sophia Jacobsen; Jivonte Johnson; Jayvione Lewis; Makenzie Moler; Jaquan Patton; Joshua Petefish; Emma Timberlake; Harrison Woods; Tony Young

*Plaintiff*s

v.

John Does, 1-22; Ian Lawler

*Defendant*s

Michael McTaggart; Brandon Holtan

*Defendants - Appellees*

-4-

Chris Hardy; Brendan Egan; Jeremy Betts; Tyler Palmer; David Chiodo; Timothy Coughennower; Benjamin McCarthy; Nick Smith; Adam Herman; Todd Wilshusen

*Defendant*s

Ken Callahan

*Defendant - Appellee*

Ryan Armstrong; Tyler Moffatt; Jacob Hedlund; Kyle Gruver; Nicholas Valentine; Clark Allen; Ernesto Escobar-Hernandez; Chad Nicolino; Jeffrey George; Brad Youngblut; Jake Forrester

*Defendant*s

Kirk Bagby

*Defendant - Appellee*

Dana Wingert

*Defendant*

City of Des Moines, Iowa; Polk County Iowa

*Defendants - Appellees*

City of West Des Moines; City of Altoona

*Defendant*s
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

-5-

Appellate Case: 23-2268    Page: 5    Date Filed: 09/30/2024 Entry ID: 5441087

Submitted: May 8, 2024
Filed: September 5, 2024 (Corrected: September 30, 2024)
_____

Before SMITH, KELLY, and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

Des Moines police and Polk County, Iowa deputies arrested 14 people during a night of civil unrest. Alleging violations of their Fourth Amendment rights, the arrestees sued 53 defendants under 42 U.S.C. § 1983. These fractured appeals follow the district court's summary judgment and qualified immunity rulings involving 14 plaintiffs and 21 named defendants. As explained further below, we affirm in part, dismiss in part, reverse in part, and remand for further proceedings.

I.

We start with a general description of the facts giving rise to these appeals. In the wake of George Floyd's death, protests rocked downtown Des Moines. On May 29, 2020, things started peacefully before devolving into conflict. The next day went much the same. As the evening turned into the early morning hours of May 31, downtown alternated between calm and chaos.

At 11:07 p.m. on May 30, police declared an unlawful assembly at the Iowa State Capitol Building, where protests had grown violent, and issued dispersal orders. After they deployed pepper spray and tear gas, the protesters moved west across the river. They settled at the Court Avenue District, about a mile away from the Capitol. An hour later, the crowd of about 200 to 250 people turned back across the river and toward the Des Moines Police Station. The police formed a line, and at about 12:30 a.m., they deployed tear gas and broadcast an order to "clear the [Court Avenue] bridge." The following image shows where and when police issued dispersal orders:

-6-

Appellate Case: 23-2268    Page: 6    Date Filed: 09/30/2024 Entry ID: 5441087



The crowd complied with the order at the bridge and retreated to the Court Avenue District. At 12:45 a.m., someone threw a projectile that knocked an officer to the ground. Fifteen minutes later, police—who outnumbered protesters—formed another line. The next hour passed mostly without incident as the crowd mixed with the Court Avenue bar scene. Just before 2:00 a.m., the Des Moines Police Chief dismissed his officers for the night. But the calm was short-lived.

Around 2:25 a.m., the crowd "unexpectedly became agitated and violent." A small group soon broke off, moved west, and ransacked a Hy-Vee grocery store. The looters scattered as an initial wave of officers moved in from the east. Secondary waves of officers were directed to clear the Court Avenue area and prevent riotous groups from reforming. They swept through the area east of the Hy-Vee around 2:37 a.m. But by then, it was mostly peaceful.

Appellate Case: 23-2268    Page: 7    Date Filed: 09/30/2024 Entry ID: 5441087

Michael Klingenberg, Joshua Petefish, Cameron Lard, Vernon DeBrossard, Cierra Dunn, Trentae Fugate, and the Patton group—comprising Jaquan Patton, Jayvione Lewis, Jivonte Johnson, Emma Timberlake, Sophie Jacobsen, and Tony Young—were all arrested between 2:49 and 4:00 a.m. The image below shows when and where:



This lawsuit followed. In response to multiple cross-motions for summary judgment, the district court issued a comprehensive, well-reasoned opinion with around 800 unique rulings. We consider just a few of them.

We begin with the Des Moines defendants'[1] appeal. They challenge the denial of qualified immunity to several officers and the grant of summary judgment to some

---

[1]They are Captain Chris Hardy, Officers Ian Lawler, Michael McTaggart, Brandon Holtan, Brendan Egan, Jeremy Betts, David Chiodo, Timothy Coughennower, Benjamin McCarthy, Adam Herman, Todd Wilshusen, Ryan Armstrong, Jacob Hedlund, Kyle Gruver, Nicholas Valentine, Clark Allen, Ernesto Escobar-Hernandez, Brad Youngblut, Kirk Bagby, and 22 John Does.

-8-

Appellate Case: 23-2268   Page: 8   Date Filed: 09/30/2024 Entry ID: 5441087

of the plaintiffs.  We then move to Polk County Deputy Nick Smith's appeal from the court's denial of qualified immunity.  And we finish with Dunn and Fugate's cross-appeal from the court's grant of qualified immunity to Des Moines Officer Holtan and Polk County Deputy Ken Callahan.

## II.  The Des Moines Defendants' Appeal

The Des Moines defendants appeal from the district court's denials of qualified immunity and grants of summary judgment.  We review both *de novo*, *Bates v. Richardson*, 97 F.4th 582, 585 (8th Cir. 2024); *Peterson v. Heinen*, 89 F.4th 628, 633 (8th Cir. 2023), but through different evidentiary lenses.  Reviewing a grant of summary judgment, we take the facts in the light most favorable to the nonmovants and make all reasonable inferences in their favor.  *Bates*, 97 F.4th at 585.  For a denial of qualified immunity, we view the record and make inferences in the plaintiffs' favor.  *Peterson*, 89 F.4th at 633.

The core of this appeal is the pretrial denial of qualified immunity to officers, which we have limited jurisdiction to review.  *Jackson v. Gutzmer*, 866 F.3d 969, 975 (8th Cir. 2017).  Accepting as true "the facts that the district court specifically found were adequately supported" and those it likely assumed, *Roberts v. City of Omaha*, 723 F.3d 966, 972 (8th Cir. 2013) (citation omitted), we ask if they "demonstrate the deprivation of a constitutional or statutory right" and if "the right was clearly established at the time of the deprivation," *Peterson*, 89 F.4th at 633 (citation omitted).  "We review each defendant's conduct individually."  *Id.*

## A.  Blanket Probable Cause

The Des Moines defendants' opening salvo is broad.  They insist that they are entitled to qualified immunity on the unlawful arrest claims because they had probable cause to arrest anyone in the vicinity of the Court Avenue District for any of three misdemeanors:  participation in a riot, Iowa Code § 723.1; unlawful assembly, § 723.2; and failure to disperse, § 723.3.

-9-

A warrantless arrest is reasonable under the Fourth Amendment "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). And in May 2020, it was clearly established that "a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 984 (8th Cir. 2019) (citations omitted). But officers are still entitled to qualified immunity if they have arguable probable cause—that is, "if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008).

Iowa prohibits "willingly join[ing] in or remain[ing] a part of" a riot or an unlawful assembly. §§ 723.1, 723.2. At the time, it defined a "riot" as "three or more persons assembled together in a violent manner, to the disturbance of others, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage." § 723.1. An "unlawful assembly" was "three or more persons assembled together, with them or any of them acting in a violent manner, and with intent that they or any of them will commit a public offense." § 723.2. The touchstone for both is violence. *See Williams v. Osmundson*, 281 N.W.2d 622, 624–25 (Iowa 1979) (construing § 723.1).

The officers do not point to any "facts and circumstances within their . . . knowledge" suggesting that the individual plaintiffs participated in the riots or unlawful assemblies, let alone that they were violent. *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (discussing probable cause standard). And "mere presence at the scene of a riot" or unlawful assembly "is not punishable." *Williams*, 281 N.W.2d at 624; *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search [or seize] that person."). So the officers lacked actual and arguable probable cause to arrest the plaintiffs for violating § 723.1 or § 723.2. *See Welch v. Dempsey*, 51 F.4th 809, 813 (8th Cir. 2022).

-10-

That's where Iowa's failure to disperse statute comes in.  An officer "may order the participants in a riot or unlawful assembly or persons in the immediate vicinity of [one] to disperse."  § 723.3.  Anyone "within hearing distance" of the command commits a misdemeanor if she "refuses to obey."  *Id.*  But the officers have not shown that each plaintiff was within earshot of an order to disperse and refused.  *Cf. Small v. McCrystal*, 708 F.3d 997, 1004 (8th Cir. 2013) (denying qualified immunity where, according to plaintiff, officers did not order him to disperse).  Instead, they argue that they could reasonably assume that *anyone* who was in the downtown area after they broadcast dispersal orders at the Capitol and police station had participated in the unlawful gatherings and had failed to disperse.

"The breadth of the officers' position illustrates the obviousness of its shortcoming."  *Bell v. Neukirch*, 979 F.3d 594, 609 (8th Cir. 2020).  The district court found that "officers did nothing to control ingress or egress to the area," so it wasn't just looters and rioters filling the streets of downtown Des Moines—an area home to apartment buildings, hotels, and a lively bar scene.  There were people going about their normal lives.  Even among the protesting crowds, many were "merely standing around, mingling and dancing."  No reasonable officer would have believed that *every* person he encountered hours after giving dispersal orders and blocks away had violated Iowa law.

To skirt the general requirement that "a search or seizure of a person must be supported by probable cause particularized with respect to *that person*," *Ybarra*, 444 U.S. at 91 (emphasis added), the officers point us to *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012).  In *Bernini*, we found that a "mass arrest" may be constitutional where police have "grounds to believe all arrested persons were a part of the *unit* observed violating the law."  *Id.* at 1003 (quoting *Carr v. District of Columbia*, 587 F.3d 401, 407 (D.C. Cir. 2009)).  In other words, "[w]here there is a unit, the Fourth Amendment does not require a probable cause determination with respect to each individual in a large and potentially riotous group before making

-11-

arrests." *Baude v. Leyshock*, 23 F.4th 1065, 1072 (8th Cir. 2022) (cleaned up) (quoting *Bernini*, 665 F.3d at 1003).

But this isn't *Bernini*. There, outnumbered officers confronted a group at the intersection of a busy roadway who "chanted in unison, lined up directly across from the police, donned gasmasks and other face coverings as if preparing for a confrontation, and were otherwise acting or moving as a unit or group." *Baude*, 23 F.4th at 1072 (cleaned up) (quoting *Bernini*, 665 F.3d at 1004). Because it was "impractical for [the officers] to detain immediately the dozens of individuals present at the intersection," we said that it was reasonable for them to move the unit to a park and make a "mass arrest." *Bernini*, 665 F.3d at 1004–05. As they did, the unit began to envelop innocent bystanders. *Id.* Given the actions of the unit and the exigencies, we held that the officers' allegedly mistaken belief that some of the plaintiffs caught up in the move were part of the unit was objectively reasonable. *Id.* The officers did not act indiscriminately. Once they got to the park, they tried to figure out "who had been part of the unit at the intersection and released" about half of those seized. *Id.*

The plaintiffs here did not move as a unit primed for confrontation—they were among the many people "freely entering and exiting the area." *Baude*, 23 F.4th at 1072–73 (rejecting claim that "a few people noisily proclaiming their constitutional right to assemble, but others who were generally gawking and milling about, others on bikes riding through the area, some people sitting on the street and on the sidewalk, and even a person pushing a baby in a stroller" was a "unit"). Any units that may have formed at the Capitol and police station protests had long since disbanded. And the plaintiffs were not scooped up in a mass arrest. They were found scattered around the Court Avenue area hours after the protests. *Cf. Bernini*, 665 F.3d at 1005; *Baude*, 23 F.4th at 1070–73 (mass arrest following kettling).

The officers remind us that "[p]robable cause is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians act." *Bell*, 979 F.3d at 603 (cleaned up) (quoting *Kaley v. United States*,

-12-

Appellate Case: 23-2268    Page: 12    Date Filed: 09/30/2024 Entry ID: 5441087

571 U.S. 320, 338 (2014)). They leave out the rest: "*But it is a bar.*" *Id.* Mere presence blocks from where police earlier ordered protesters to disperse does not clear it.

Nor is it arguable probable cause. *Baude*, 23 F.4th at 1073 (holding that the "assertion that they had probable cause or arguable probable cause to believe some members of [a] crowd violated laws earlier in the day and that 'many' were apparently violating the law by refusing to disperse is insufficient to establish a 'unit' that may justify a mass arrest as a matter of law"). Police cannot enjoy the protections of qualified immunity "by alleging that 'the unlawful acts of a small group' justify the arrest of the mass." *Id.* (quoting *Bernini*, 665 F.3d at 1005); *see also Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) (affirming denial of qualified immunity to officer who ordered the "indiscriminate arrest" of hundreds based on the illegal acts of a small group of protesters).

Shades of this blanket probable cause argument color the officers' individual challenges. We turn to what remains of each.

## B. Klingenberg

Des Moines Officers Herman, Holtan, and McCarthy challenge the district court's denial of qualified immunity on Klingenberg's unlawful seizure claim. We affirm.

Drawn downtown by the chaos, Klingenberg and a small group were on the top floor of a parking garage about a block east of the Hy-Vee. At 2:40 a.m., the riot at the store drew officers their direction, so the group left. On his way down, Klingenberg ran into a team of officers who told him to "get outta here." He thanked one officer for his work, confirmed that no one else was on the roof, and complied with the order. As he passed a second group of officers, he raised his hands and said that he was leaving. No one tried to stop him—until he left the garage. He first passed Officer McCarthy without incident and then Officers Herman and Holtan.

-13-

Officer McCarthy says that his two colleagues told him that Klingenberg "was involved in this stuff" and "need[ed] to be put in cuffs," so he arrested him.

As the district court noted, "[b]eyond his mere presence, . . . the record is devoid of any reason <u>why</u> [the officers] believed Klingenberg should be arrested." Officers Holtan and Herman could not say where or when they had seen Klingenberg being "involved in this stuff," and they never questioned him. They also ignored "readily available" exculpatory evidence: he was "more than one block east of the unruly crowd at Hy-Vee" and in the opposite direction from where that crowd dispersed when officers arrived. Relying on *Johnson v. City of Minneapolis*, the court found that the facts, when viewed in the light most favorable to Klingenberg, made this the "paradigmatic case where probable cause is lacking." 901 F.3d 963, 971 (8th Cir. 2018). And it concluded that a jury could find that it was unreasonable for Officer McCarthy to arrest Klingenberg on his fellow officers' instructions.

The officers ignore the court's reasoning and instead advance their own view of the facts. They say that Klingenberg "lingered in the area for several minutes before he walked right in front of law enforcement officers who immediately suspected him of engaging in illegal conduct." Taken in Klingenberg's favor, of course, the record says otherwise. He was trying to leave the area. And walking by officers doesn't cut it. It should go without saying that an officer lacks probable cause to arrest someone he hasn't observed do anything wrong. *See id.* at 970 ("[T]he bread and butter of arguable probable cause is some observation—either by officers personally or by an eyewitness or victim whose account is communicated to officers—of the *actus reus* of a potential crime."). There was no observation here. All told, the "quantum of facts 'within [Officers Holtan and Herman's] knowledge' were only a shade above wrong place, wrong time." *Id.* at 969 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

For his part, Officer McCarthy argues that he was just following instructions to arrest Klingenberg and reasonably relied on the "collective knowledge" of his fellow officers to justify it. *See Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005)

-14-

(en banc) ("[L]aw enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable"). We disagree. What he received was a "vague, conclusory statement"—that Klingenberg was "involved in this stuff"—which was neither an observation of a criminal act nor "[]sufficiently specific to support" the arrest. *Chestnut v. Wallace*, 947 F.3d 1085, 1092 (8th Cir. 2020) (affirming denial of qualified immunity where "[t]he only relevant information relayed" to officer was that plaintiff was "suspicious"). We affirm the denial of qualified immunity to Officers Herman, Holtan, and McCarthy against Klingenberg.

## C. Petefish

Des Moines Officer Lawler challenges the district court's denial of qualified immunity on Petefish's unlawful seizure claim. We dismiss his appeal for lack of jurisdiction.

Like Klingenberg, Petefish wanted to watch the protests, so he stood on a bench for a better vantage point. A few people were around him, but none were "holding protest signs or doing anything illegal." Five officers, including Lawler, crossed the street toward the group and told them to go home. The district court found that there was no evidence that Petefish was present for any protests or heard any dispersal orders before this interaction. And the officers did not see Petefish do "anything violent, threatening, or otherwise illegal"—he "was more than two blocks away from the unlawful group at Hy-Vee." So "[a]t most," he "simply walked around in a roughly one-block area" before "turning to leave immediately after being directed by officers to do so."

As Petefish was leaving, someone next to him was pepper sprayed. Turning around, he asked, "What the fuck did he do wrong?" He was then sprayed, pushed to the ground, and handcuffed by someone. Officer Lawler "took custody" of Petefish and walked him to a police van for transport. He argues that he merely acted "at the direction of others" and did not personally participate in the arrest. But

-15-

those facts are disputed.  The district court found that, while Petefish appeared to concede that Officer Lawler was not the one who handcuffed or pepper sprayed him, it wasn't clear where Officer Lawler was or what he was doing during the arrest.

Section 1983 liability "is personal," *Doran*, 409 F.3d at 965, but it is not limited to the officer who puts on the handcuffs.  It extends to all defendants who "personally participated" in the plaintiff's arrest.  *See White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017) (finding that officer personally participated in arrest where he observed it and yelled at plaintiff to "stop resisting" and plaintiff leaned against his leg after being handcuffed).  The district court's finding that there was a genuine dispute of material fact about "the extent of [Officer] Lawler's involvement in the arrest" is not "blatantly contradicted by the record," *Scott v. Harris*, 550 U.S. 372, 380 (2007), so we lack jurisdiction to review it, *Welch v. Dempsey*, 51 F.4th 809, 812 (8th Cir. 2022).

### D.  Lard & DeBrossard

Captain Hardy and Officers Egan, Betts, Gruver, Valentine, and Coughennower challenge the denial of qualified immunity on Lard's and DeBrossard's unlawful arrest claims.  Officers Betts and Coughennower also challenge the denial of qualified immunity on Lard's excessive force claim.  The record here is sharply disputed and the officers disagree with the district court's findings that genuine disputes of material fact prevented it from deciding whether there was probable cause for the arrests and whether pepper spraying Lard was justified—findings that the record does not "plainly foreclose[]." *Taylor v. St. Louis Cmty. Coll.*, 2 F.4th 1124, 1127 (8th Cir. 2021).  To reach the legal issues, "we would have to exceed our jurisdiction and cast aside the district court's factual findings, analyze the factual record, and resolve genuine disputes against [Lard and DeBrossard]." *Id.*  We dismiss these appeals for lack of jurisdiction.

-16-

### E.  The Patton Group

Des Moines Officers Holtan, Armstrong, Hedlund, Chiodo, and Herman argue that the district court erred by denying them qualified immunity and by granting summary judgment to Patton, Lewis, Johnson, Timberlake, Jacobsen, and Young on their unlawful seizure claims.  We affirm the judgments.[2]

A police van passed the Patton group as they were walking two blocks north of Court Avenue around 3:20 a.m.—when officers had regained "complete and total control of the streets."  The Patton group says someone yelled at the van, but the officers say they shouted expletives and made crude gestures.  The van stopped, and out poured several officers who immediately arrested the group.  The plaintiffs say that they were heading to Patton's apartment across the street.

The officers argue that three facts support probable cause:  (1) the Patton group was "walking together and hurling expletives"; (2) an unknown officer "recognized the group from earlier"; and (3) Patton's address on his ID did not match the building across the street.  First, walking and shouting expletives at a police van does not alone provide arguable probable cause to make an arrest.  *Cf. City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").  Second, we agree with the district court that the comment from an unnamed officer is "so vague and unsubstantiated" that even in that moment, a reasonable officer should have known that it was insufficient to support probable cause.  *See Chestnut*, 947 F.3d at 1090.  No exigency would have prevented even minimal investigation.  *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir.1999) ("[P]robable cause does not exist when a 'minimal further investigation' would have exonerated the suspect."

---

[2]It is unclear whether Officer Wilshusen appeals the denial of qualified immunity on Lewis's unlawful arrest claim.  If he does, we affirm.  *See United States v. Wearing*, 837 F.3d 905, 910 n.6 (8th Cir. 2016) (per curiam) (arguments not sufficiently developed in opening brief are deemed waived).

Appellate Case: 23-2268     Page: 17     Date Filed: 09/30/2024 Entry ID: 5441087

(citation omitted)).  And third, the officers do not dispute that they discovered Patton's mismatching identification *after* the arrests, so it is irrelevant.  *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) ("Facts an officer learns after the incident ends . . . are not relevant" to the qualified immunity analysis.).

Even viewing the facts in the light most favorable to the officers, the district court got it right:  the Patton group "were not present for any protests or ever ordered to disperse, yet they were arrested and hauled to jail overnight for simply parking a car and walking toward Patton's apartment."  The material facts show that the officers subjected them to warrantless arrests unsupported by arguable probable cause, meaning they violated their clearly established rights.  The court properly denied qualified immunity and granted summary judgment to the Patton group against Officers Holtan, Armstrong, Hedlund, Chiodo, and Herman.

## F.  Malicious Prosecution

Switching gears, the Des Moines officers challenge the district court's denial of qualified immunity on all 12 plaintiffs' malicious prosecution claims.  Presented with "perfunctory" briefing and an "underdeveloped" record, it concluded that the defendants had not "established sufficient undisputed facts to warrant summary judgment."  *See White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).  We agree.

When the plaintiffs were arrested, the law was clear:  a malicious prosecution claim was only cognizable under § 1983 if the "alleged wrongful conduct . . . also infringe[d] 'some provision of the Constitution or federal law.'"  *Martin v. Julian*, 18 F.4th 580, 584 (8th Cir. 2021) (citation omitted); *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001).  The Des Moines defendants took a more categorical approach below.  They argued that malicious prosecution claims "do not exist" under federal law.  That was wrong.  Before the Des Moines defendants moved for summary judgment, the Supreme Court held that malicious prosecution is actionable under the Fourth Amendment.  *Thompson v. Clark*, 596 U.S. 36, 43

-18-

(2022) (stating that the "gravamen" of the claim "is the wrongful initiation of charges without probable cause").

Conceding that malicious prosecution is a viable § 1983 claim, the defendants argued below that the plaintiffs had not shown "actual malice" under Iowa law. *See Vander Linden v. Crews*, 231 N.W.2d 904, 905 (Iowa 1975) (establishing that plaintiffs must make an "affirmative showing" that prosecution was "*primarily inspired by ill-will, hatred or other wrongful motives*"). The district court noted that "the record reveals very little about what happened between the night of the arrests and the eventual dismissal of charges." And it concluded that the standard under the Fourth Amendment differs from Iowa law—a jury can infer malice from a lack of probable cause. *See Thompson*, 596 U.S. at 44 (observing that as of 1871, American courts often defined "malicious" motivation to prosecute as "without probable cause and for a purpose other than bringing the defendant to justice"); *Luke v. Gulley*, 50 F.4th 90, 97 (11th Cir. 2022) (observing that as of 1871, "proof of the absence of probable cause allowed a jury to infer malice for the common-law tort of malicious prosecution").

On appeal, the defendants do not engage with the court's analysis of federal and Iowa law, and we will not make their arguments for them. *See Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 324 (8th Cir. 2018). Instead, they argue for the first time that it was not *clearly established* that a standalone malicious prosecution claim is cognizable under § 1983. *See Wallace v. Taylor*, No. 22-20342, 2023 WL 2964418, at *6 (5th Cir. Apr. 13, 2023) (observing that a claim it had "expressly not recognized is the antithesis of a clearly established one" (cleaned up)). And they mount several new substantive attacks. While we ordinarily do not consider newly raised arguments, we may exercise our discretion to do so "if it is purely legal and requires no factual development, or if a manifest injustice would otherwise result." *Combs v. The Cordish Cos., Inc.*, 862 F.3d 671, 678–79 (8th Cir. 2017) (citation omitted). But "[i]t is old and well-settled law that issues not raised in the trial court *cannot be considered by this court as a basis for reversal*." *Morrow v. Greyhound Lines, Inc.*, 541 F.2d 713, 724 (8th Cir. 1976)

-19-

(emphasis added); *see also Meinen v. Bi-State Dev. Agency*, 101 F.4th 947, 951 n.3 (8th Cir. 2024).  Because that is what the Des Moines defendants ask here, we decline to address the appropriate standard for malice under the Fourth Amendment, the other substantive arguments, and whether the claim was clearly established.

## G.  The Phone Seizures

The final issue in the Des Moines defendants' appeal involves phone seizures. When Lard, DeBrossard, Patton, Johnson, Young, and Lewis got to the jail, Officer Youngblut seized their phones for two days—"*Terry*-stop style."  The district court denied Officer Youngblut qualified immunity on Lard and DeBrossard's unreasonable seizure claims and granted summary judgment to Patton, Young, Johnson, and Lewis.  We affirm the judgments.

The Fourth Amendment allows the warrantless seizure of private property where police can establish that probable cause exists to believe that it contains "contraband or evidence of a crime" and that a warrant exception applies.  *United States v. Place*, 462 U.S. 696, 701 (1983).  Extending the reasoning of *Terry v. Ohio*, 392 U.S. 1 (1968), in a line of luggage-seizure cases, the Supreme Court created a narrow carveout to this general rule.  "[F]or limited investigative purposes," police may "briefly detain" personal effects on reasonable suspicion alone if the seizure is "so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests" justify it.  *Place*, 462 U.S. at 705–06.

Officer Youngblut argues that he had reasonable suspicion to seize the phones because it was "logical to believe" that they held evidence of a crime given how people tend to use smart phone cameras and "the nature of the property destruction, looting, vandalism, and related riotous behavior" on May 31.  But he does not point to any evidence showing that officers saw the plaintiffs taking videos of the events or participating in violent behavior.  Nor does he identify the governmental interest in seizing the phones.  We assume that it is "effective crime prevention and detection," *id.* at 704, in the face of what he calls "ongoing unrest and rioting."  A

-20-

strong interest.  But it does not outweigh the degree of intrusion on the plaintiffs' Fourth Amendment interests, which is greater here than in *Place*.[3]  After all, it is "no stretch to hazard that a modern-day traveler would likely rather arrive in a strange place without her luggage than without her phone."  *Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021) (quoting *United States v. Babcock*, 924 F.3d 1180, 1191 (11th Cir. 2019)); *cf. Riley v. California*, 573 U.S. 373, 393–94 (2014) (observing that cell phones are "minicomputers" that can reconstruct "[t]he sum of an individual's private life" and so "differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person").

Though the Court "decline[d] to adopt any outside time limitation" in *Place*, "the brevity of the invasion" dominated the analysis.  462 U.S. at 709.  And as in *Place*, the length of the detention here "alone precludes" finding that the phone seizures were reasonable absent probable cause.  *Id.* at 709–10 (90-minute seizure of luggage unreasonable); *see Babcock*, 924 F.3d at 1192 (two-day seizure of cell phone unreasonable).  Officer Youngblut's lack of diligence doesn't help.  The district court found nothing in the record that shows he "or any other officer did anything on May 31 to start the process of trying to obtain warrants for any of the cell phones."  And he provides no justification on appeal beyond a belated realization that "it would be very difficult, even with a warrant, for [officers] to be able to access information on the phones."  *Cf. Robbins*, 984 F.3d at 681 (finding lack of diligence in part based on officer's comment that he would apply for a warrant "at some point"); *Missouri v. McNeely*, 569 U.S. 141, 172–73 (2013) (Roberts, C.J., concurring in part and dissenting in part) (describing how fast the warrant request process is).

---

[3]We assume without deciding that the Court's reasoning applies equally to cell phones.  *See Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021); *United States v. Babcock*, 924 F.3d 1180, 1188 (11th Cir. 2019) (observing that "any detention of property based on reasonable suspicion must be fairly analogous to a *Terry* stop, regardless of the item at issue").

-21-

The seizure of the plaintiffs' phones exceeded "the narrow authority . . . to detain briefly" private property on reasonable suspicion alone. *Place*, 462 U.S. at 710. Officer Youngblut's inability to advance more than threadbare claims of "specific and articulable facts," *Terry*, 392 U.S. at 21, only underscores the violation. Unless he had arguable probable cause to seize the phones, he violated the plaintiffs' clearly established right to be free from unreasonable seizures of their property and is not entitled to qualified immunity. *See Robbins*, 984 F.3d at 681. Officer Youngblut argues that he has it because there was probable cause to arrest each plaintiff. As we have just discussed, the officers lacked even arguable probable cause to arrest Patton, Johnson, Young, and Lewis, so we affirm the denial of qualified immunity to Officer Youngblut and the grant of summary judgment to the plaintiffs on their phone seizure claims. And because probable cause is disputed in Lard's and DeBrossard's cases, we affirm the denial of qualified immunity to Officer Youngblut.

\*\*\*

As the district court observed, "[p]olice work is difficult, particularly in times of civil unrest." But the Constitution puts "limits on what law enforcement officers can do," and they "can be held liable in some instances when those Constitutional boundaries are crossed." For the benefit of the district court and the parties, we recap our rulings.

- We affirm the denial of qualified immunity to Officers Herman, Holtan, and McCarthy on Klingenberg's unlawful arrest claim;
- We dismiss Officer Lawler's appeal from the denial of qualified immunity on Petefish's unlawful arrest claim;
- We dismiss Captain Chris Hardy and Officers Egan, Betts, Gruver, Valentine, and Coughennower's appeal from the denial of summary judgment on Lard's and DeBrossard's unlawful arrest claims;
- We dismiss Officers Betts and Coughennower's appeal from the denial of qualified immunity on Lard's excessive force claim;

-22-

Appellate Case: 23-2268    Page: 22    Date Filed: 09/30/2024 Entry ID: 5441087

- We affirm the grant of summary judgment to Patton, Lewis, Johnson, Timberlake, Jacobsen, and Young on their unlawful arrest claims against Officers Holtan, Herman, Armstrong, Hedlund, Chiodo, and Wilshusen;
- We affirm the denial of qualified immunity to the Des Moines defendants on the plaintiffs' malicious prosecution claims;
- We affirm the grant of summary judgment to Patton, Johnson, Young, and Lewis on their unreasonable seizure claims against Officer Youngblut; and
- We affirm the denial of qualified immunity to Officer Youngblut on Lard's and DeBrossard's unreasonable seizure claims.

### III.  Polk County Deputy Smith's Appeal

Deputy Smith challenges the district court's denial of qualified immunity on Timberlake's unlawful arrest claim.[4]  We reverse and direct the court to enter judgment in favor of Deputy Smith based on qualified immunity.

Timberlake was part of the Patton group, and Deputy Smith was in the police van that stopped nearby.  But Timberlake admits that Deputy Smith wasn't one of the "initial officers who approached the group," and everyone was arrested "within thirty seconds or so of [the officers] encountering them."  Deputy Smith testified that "[t]here were people ahead of me so I think as they approached the initial six, everybody just kind of went down the line and somebody put [Timberlake] in wrist restraints."  When he got to Timberlake, he says, she'd already been arrested.  He testified that he only "stepped up" to hold her arm so she wouldn't run.  The

---

[4]Deputy Smith also challenges the denial of summary judgment as to punitive damages on Timberlake's false arrest claim.  Timberlake argues that we lack jurisdiction because it is not "inextricably intertwined" with his defense of qualified immunity. *Veneklase v. City of Fargo*, 78 F.3d 1264, 1269 (8th Cir. 1996).  Deputy Smith does not resist, and we will not make his argument for him. *See Webster v. Westlake*, 41 F.4th 1004, 1009 (8th Cir. 2022) (declining to reach the "inextricably intertwined" question where appellants "did not meet their burden to show appellate jurisdiction"), so we dismiss this part of Deputy Smith's appeal.

Appellate Case: 23-2268     Page: 23     Date Filed: 09/30/2024 Entry ID: 5441087

testimony lines up with the court's finding that he "held onto Timberlake for three to five minutes *after she had already been arrested and restrained by another officer* to ensure she did not flee."

Unlike Officer Lawler and Petefish, the district court did not find that factual disputes about Deputy Smith's involvement in *Timberlake's* arrest precluded granting qualified immunity.  Rather, the court denied qualified immunity because it could not tell whether he arrived on scene late enough to be "entitled to assume" that the other officers had made "an appropriate probable cause inquiry" before he took custody of Timberlake.  The issue boils down to whether it was clearly established that Deputy Smith had an independent duty to ensure the arrest was lawful before taking post-arrest custody of Timberlake.

Timberlake has not pointed to any controlling authority or robust consensus of persuasive authority that "'squarely governs' the facts here" and puts the constitutional question "beyond debate."  *Mullenix v. Luna*, 577 U.S. 7, 15–16, (2015) (per curiam) (citations omitted); *see Molina v. City of St. Louis*, 59 F.4th 334, 343–44 (8th Cir. 2023) (in a First Amendment retaliation case, holding that jury could infer each officer inside armored car from which unknown officer launched tear-gas canister either participated in decision or else failed to intervene); *Provost v. City of Newburgh*, 262 F.3d 146, 155–56 (2d Cir. 2001) (finding insufficient evidence for jury verdict that supervisor—who told officer to "handle" dispute and stood "a few feet away" during arrest—"personally participated" in arrest because it would be mere "speculation" to say he was "aware of the facts surrounding" it).

And we do not think the cases in this area would have put Deputy Smith on notice that his post-arrest conduct was unlawful.  *See, e.g.*, *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020) (reiterating that "[t]he existence of probable cause 'depends upon the reasonable conclusion to be drawn from the facts known to the *arresting officer* at the time of the arrest'" (emphasis added) (quoting *Devenpeck*, 543 U.S. at 152)); *Mitchell v. Shearrer*, 729 F.3d 1070, 1073 (8th Cir. 2013) (noting that there was no evidence officers who arrived during "scuffle" with plaintiff and

-24-

"assisted [officer] in subduing and handcuffing" plaintiff were "involved in the decision to arrest" or "knew or should have known that the seizure was unlawful"); *Garionis v. Newton*, 827 F.2d 306, 310 (8th Cir. 1987) (observing that "a person who is already under arrest and in police custody cannot be 'rearrested'" and finding "no need for probable cause" when officer "took custody" of plaintiff); *Coleman v. Gillespie*, 424 F. App'x 267, 270 (5th Cir. 2011) (explaining that "transfer of an arrestee from the custody of one officer to another does not effect a separate arrest or seizure" unless "the second officer performs his own full investigation before independently deciding whether to take custody of the suspect"). Based on this lack of authority, we reverse the district court's denial of qualified immunity to Deputy Smith.

## IV.  Dunn and Fugate's Cross-Appeal

We finish with the cross-appeal. The district court granted qualified immunity to Officer Holtan on Dunn's and Fugate's unlawful arrest claims and to Deputy Callahan on Fugate's unlawful arrest claim. We affirm.

Just before 3:00 a.m., about 20 minutes after the Hy-Vee looters scattered, Dunn and Fugate parked near the Savery Hotel, a couple of blocks north of Court Avenue. After they got out of the car, Officer Holtan ordered them to disperse. Dunn responded that they were just going to their hotel and then shouted, "we're walking to our fucking hotel!" Dunn, Fugate, and a friend left the hotel about an hour later. Officer Holtan recognized the "heckler[s]" as they made their way to the car, so he, Deputy Callahan, and others approached to arrest them for failing to disperse. Dunn and Fugate started to get in the car, but their friend bolted.

The district court properly found that Officer Holtan and Deputy Callahan had at least arguable probable cause for the arrests. Recall that Iowa's failure to disperse misdemeanor requires that plaintiffs (1) be "participants in" or "in the immediate vicinity of a riot or unlawful assembly"; (2) be "within hearing distance of" a command to disperse, and (3) "refuse[] to obey." § 723.3.

-25-

Dunn and Fugate concede that they heard the dispersal order—a fact that separates them from the other plaintiffs. But they argue that they were not "participants in" or "in the immediate vicinity of" the Hy-Vee unrest, *id.*, which would undermine the lawfulness of the command. They cite no authority interpreting § 723.3 that places such constraints on an officer's ability to issue a dispersal order. Even if the order was in fact unlawful, the question was not "beyond debate." *Mullenix*, 577 U.S. at 12 (per curiam). The only issue remaining is whether an officer could reasonably believe that Dunn and Fugate had refused to disperse. They argue that no officer could have viewed their getting into the car as anything but dispersing. But an officer seeing them in the same place an hour after giving the command could reasonably conclude that Dunn had lied about going to the hotel and that the two had instead refused to disperse—that is, they had missed their chance to comply.

Officer Holtan and Deputy Callahan may have been mistaken in believing that they had probable cause, but that belief was not objectively unreasonable. Because they had arguable probable cause to arrest Dunn and Fugate under § 723.3, they are entitled to qualified immunity.

V.

We affirm in part, dismiss in part, reverse in part, and remand for proceedings consistent with this opinion.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's well-reasoned opinion in all respects but one: I would affirm the denial of qualified immunity to Deputy Smith. As the district court explained, Deputy Smith might have arrived at the Patton group arrest "late enough to be entitled to assume the other officers had made an appropriate probable cause inquiry. Conversely, he might have seen enough to know there was no lawful basis

-26-

for arrest." Viewing the facts in the light most favorable to Timberlake, *Peterson*, 89 F.4th at 633, Deputy Smith knew he lacked probable cause when he participated in her arrest. On this record, the district court properly denied qualified immunity on Timberlake's claim. For this reason, I respectfully dissent from Part III of the court's opinion.

_____

Appellate Case: 23-2268    Page: 27    Date Filed: 09/30/2024 Entry ID: 5441087